[No. 6728. Decided October 19, 1907.]

WILLIS H. WHITE *et al.*, *Plaintiffs*, v. JOSEPH MATZGER *et al.*, *Respondents*, DEXTER HORTON & COMPANY, Bankers, *Appellant*, and FIRST NATIONAL BANK OF SEATTLE, *Intervener and Appellant*.[1]

FRAUD—CONSPIRACY—EVIDENCE—SUFFICIENCY. Where it appears that upon a sale of real estate, the vendor, an illiterate person without any business experience, desiring a rescission of the sale, was misled by the fraudulent advice of his attorney that he was under no obligation to complete the sale, and that he could get the land back if he would make a deed to the attorney for the purpose of arranging the matter and also thereby securing the attorney's fee, there is no sufficient evidence that the vendor fraudulently colluded with the attorney to defraud certain banks, to whom the attorney

[1]Reported in 92 Pac. 341.

made a deed of the premises as security for loans, especially where
the loans to the attorney for the most part already existed, or were
made upon the representations of the attorney, and without any ex-
amination of an abstract of title, which would have disclosed the in-
ability of the vendor to make the deed to the attorney. .

Appeal from a judgment of the superior court for King
county, Albertson, J., entered December 10, 1906, upon find-
ings in favor of the defendants Matzger, after a trial on the
merits before the court without a jury, upon issues between
the defendants and an intervener as to the right to the pro-
ceeds of the sale of real property.   Affirmed.

*Peters & Powell*, for appellant.

*James Kiefer*, for intervener.

*Gray & Stern* and *Harold Preston*, for respondents.

DUNBAR, J.—This action was brought for specific perform-
ance of a contract for the purchase and sale of real estate.
The contract was made between Joseph Matzger and Etta
Matzger, his wife, owners of the property, and Willis H.
White, the purchaser.   White subsequently assigned the con-
tract to his coplaintiff, H. P. Craig.   Subsequent to the mak-
ing and execution of the above contract, Matzger and wife
executed a deed of the same to defendant Jennie McCalmont,
for reasons which we shall hereafter notice, who in turn con-
veyed to the defendant Benson, and the latter executed a deed
to Dexter Horton & Company, Bankers, which deed was in
fact a mortgage to secure an indebtedness due by Benson to
Dexter Horton & Company, Bankers.   The intervener, the
First National Bank of Seattle, also claims under this mort-
gage.   The right of White and Craig, plaintiffs, to a specific
performance is not questioned in this action, the contention
being that Dexter Horton & Company, Bankers, and the in-
tervener, First National Bank, are entitled to have their
claims paid first out of the purchase price.   The trial court
entered a decree awarding specific performance of the con-

tract to the plaintiffs, and directing that the entire purchase price be paid to the defendants Matzger; and denied any relief to either the defendant Dexter Horton & Company, Bankers, or the intervener, First National Bank of Seattle. The plaintiffs paid into court the full amount called for by the contract and remaining unpaid. That part of the judgment refusing to decree the satisfaction of the liens of the respective banks has been appealed from.

The plaintiffs, after the commencement of the action, amended their complaint and brought in Dexter Horton & Company, Bankers, by reason of the claim that it made as holder of the deed to the property from Benson. The answer of the bank is to the effect that, on the 22d day of May, it loaned to the defendant Benson and wife the sum of $3,000, for which sum the said Benson and wife, together with one C. W. Prouty, executed and delivered to it their joint and several promissory note, whereby they promised and agreed to pay in ninety days the said sum of $3,000 with interest, etc., and that at the same time, as a part of the same transaction and in order to secure the payment of the said sum of $3,000, so loaned, the defendant Benson and wife executed and delivered to it a good and sufficient deed of conveyance to lot 9, in block 49, of A. A. Denny's addition to the city of Seattle, which is the property in controversy; that the said Benson exhibited to it a deed to the said lot from Mrs. McCalmont, and that Benson represented himself to be the owner of the same; that the defendants Matzger had entered into a fraudulent conspiracy with Benson to deed the land to Mrs. McCalmont, and that, by reason of said fraudulent acts on their part, the bank had been misled as to the legal title to said lot.

The First National Bank of Seattle intervened, setting up substantially the same state of facts, claiming that it had loaned money to Benson on the strength of this deed from Mrs. McCalmont, and alleging fraudulent action on the part

of the Matzgers as the cause of their loaning the said money to Benson. These actions were denied by the Matzgers, they claiming that they had acted under the advice of Benson as an attorney, employing him to defend their legal rights, he having represented to them that they were under no legal obligation to deed the land to the plaintiffs under the contract which they had made with the plaintiff White. This action was commenced on April 26, 1906, by the filing of a complaint and *lis pendens*. The deed from the Matzgers to Mrs. McCalmont was executed March 30, 1906; the deed from McCalmont to Benson, on April 5, 1906. The deed to Dexter Horton & Company, Bankers, was made on May 22, 1906, and the loan was made on that day. The loan by the First National Bank was made on the 18th day of April, 1906. Benson, prior to the 22d of May, 1906, owed Dexter Horton & Company's bank $2,850.95, for the most of which they had his note endorsed by one Prouty on that date. They advanced Benson $149.05, and took the deed to the land in question from Benson as part security for the whole amount.

The earnest contention of the respective counsel for the two different banks is that, by reason of the alleged fraudulent conspiracy entered into between the Matzgers and Benson to prevent the plaintiff White from enforcing his contract, they were misled to their injury in extending credit to Benson. The contract entered into between Benson and the Matzgers was as follows:

"Seattle, March 30, 1906.

"For value received I hereby agree to procure from Jennie McCalmont all the right, title and interest which she this day takes from Joseph Matzger and wife; and I further agree to convey the same to Joseph Matzger and wife, on demand, in the following manner, to wit: Said conveyance to Matzger and wife shall be subject to payment in cash of my charge of one half of all said land shall be worth over and above ten thousand dollars. If I can sell same for more than the Matzgers are willing to allow as the market price, I am to have the right to pay in cash, instead of making said conveyance. This

agreement to be returned to me at the time of settlement, and
to be void if made public in any manner in the meantime, by
the Matzgers, or either of them.            E. D. Benson."
Thereafter, as we have before indicated, Benson procured a
deed to the premises from Jennie McCalmont.

The testimony in this case is not voluminous, and the whole
question is whether, by reason of the fraudulent action of the
Matzgers, they placed Benson in such a position that he could
impose upon the bankers to their injury.  Upon testifying
that he had not received any consideration for the deed to
Jennie McCalmont, the question was asked Matzger on cross-
examination: "You executed that deed under the instructions
of Benson, as a means of avoiding this contract?"  The an-
swer was:

"I went up to Benson, and Mr. — the agent who sold the
property to Mr. White, came up to me and told me that he
has the right to sell the property, and I says to the agent,
says: 'If I can buy back the property I will pay White the
$5,000,' and I went up to Mr. Benson in explaining that I
want to pay to Mr. White the $5,000 as Mr. Knight has the
right to sell the property.  Mr. Benson told me that if Mr.
White would not take the $5,000 back from me, as he had
agreed to take from Mr. Craig, and Mr. Knight has got a
right to sell it, he says, I would not have a right to deliver
the property.  I do not know what he mean.  He is a good
lawyer.  He says: 'I know the law, that you get that prop-
erty back, if you do just as I tell you.  You have to have all
confidence in me, and I will do what is right.  I was a judge
and I have the best reference.' "

He also testified that he did not know the reason why Ben-
son wanted the deed, saying, "In truth, I did not know then
what the deed means;" but that Benson assured him that he
was under no legal obligation to convey the property to
White; that he could tender White the $5,000 which he was
willing to advance to get the property back, and that if White
would not take it, they could beat him by law, and that he
could not be compelled to deliver the property; that he relied

implicitly upon Benson's advice in the matter, and was simply seeking to obtain his legal rights. The cross-examination, it seems to us, did not place any different phase upon the testimony of the witness Matzger.

But even if there had been a fraudulent attempt on the part of Matzger to avoid fulfilling the contract which he had entered into with White, it seems to us that the testimony absolutely fails to show that the money loaned to Benson was loaned by either of the banks on the security of the deed to this lot. In the case of Dexter Horton & Co., it will be observed that all of the money, excepting $149.05, had already been loaned to Benson; and Mr. Latimer, who was the manager of the bank and the only witness testifying in its behalf, stated that he did not examine the title to the land. When asked if he had asked for an abstract of title at the time he took the deed, he said:

"I did not, Judge, for the reason that Judge Benson came in to see me in reference to these two notes which were then already due, and expressed a desire to get a little more money, and told me that he had just gone through with a careful examination of this property, and showed me this conveyance which had not yet been recorded, and, knowing the judge as I had for so long, I accepted the title. I was advancing without requiring an abstract."

He testified that Judge Benson had been a patron of the bank for ten or twelve years, and that he had confidence in him not only with relation to the title to the land, but of its value and future; that the increased amount was small, and that he was getting the additional names of the wife and Mr. Prouty, whom he said he considered fairly good, as an indorser on the value of this property, and for that reason, said the witness, he accepted Mr. Benson's statements. He testified that he would not have loaned him $3,000 as a primary loan on that day without having the title examined and an abstract furnished; "but," said the witness, "he offered me Mr. Prouty's and his wife's signature, in addition; and at that same time he

explained to me a sale which he had pending of his residence, with which he expected to pay all of his indebtedness at an early date."

Question: "Would you have loaned that amount of money as a new loan taking that security without an examination of the title?" Answer: "To Judge Benson alone?" Q. "Yes." A. "Oh, I don't think I would have made a new loan to Judge Benson alone without taking an abstract and examining the title, but the circumstances under which this came up, I did feel justified in accepting his statement of the title." Q. "Because he owed you the money—he already owed $2,800, and you had Prouty's endorsement already for $2,500?" A. "$2,500. But I did not have Mrs. Benson's name on either of those former notes."

And much more to the same effect.

So that it plainly appears from the testimony of the witness Latimer that this small advance of $149.05 was not made on the strength of the deed which Benson exhibited, but by reason of the fact that better security was obtained for the principal amount of the indebtedness which already existed. The same thing is true of the claim of the First National Bank. In fact, the loan was made by the First National Bank prior to any knowledge it had that the deed had been given to Dexter Horton & Company, Bankers, the latter bank having notified the First National Bank, on the day after it received this deed, that it had been informed by Benson that he wished the deed to act as security for the $3,000 which he owed to the First National Bank, as well as for security for the amount he owed to Dexter Horton & Company.

In addition to this, it seems that the loan was made or increased by the First National Bank by reason of representations that Benson had made to it that he was going to sell his residence property and some other property that he had, and that he would pay it when the sale was made, offering at the same time to sell to the president of the First National Bank his residence property. Before the banks could claim against

23—47 wash.

Matzger, it must be shown not only that Matzger had attempted to defraud, but that the action of the bank in loaning the money was caused by the fraudulent action of Matzger in the execution of this deed to McCalmont. The fact that Mr. Latimer never inquired into the value of this property, or its legal status, so far as the title was concerned, and that if he had made an examination of the record in the slightest degree, the true state of the facts would have been developed, shows that he was relying upon his faith in the statements of Benson and upon the improved position in which the bank's original claim was placed by reason of the additional security. Certainly, if sharp, shrewd business men, as bankers must of necessity be, conducting a business where security is the very life of the business, could rely, as they stated they did, upon the statements and standing of Judge Benson, this old, illiterate foreign tailor—and the testimony shows that he could neither read nor write English—unaccustomed to intricate business transactions, might reasonably be excused for relying upon statements made to him by an attorney to whom he had been recommended and who had been honored in the community by an elevation to the position of judge. The testimony of Matzger to the effect that the explanation which Benson made to him for the necessity of the deed to Mrs. McCalmont was that the deed was for Benson's protection so that he might be secure in his fee, seems to us to be reasonable.

Under all the circumstances of the case and the testimony introduced, we are satisfied that the findings of the court were correct, and the judgment is therefore affirmed.

HADLEY, C. J., FULLERTON, RUDKIN, MOUNT, and CROW, JJ., concur.